| | | |
|---|---|---|
| JACOB OLIVER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:18-CV-1549-B |
| | § | |
| UNIVERSITY OF TEXAS | § | |
| SOUTHWESTERN MEDICAL | § | |
| SCHOOL, ANGELA MIHALIC, and | § | |
| JON WILLIAMSON, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The University of Texas Southwestern Medical School (UTSW) expelled a medical student, Plaintiff Jacob Oliver, for violating the school's student misconduct policies based on a physical altercation that allegedly occurred between Oliver and his former fiancée. Oliver was expelled from medical school after a disciplinary investigation and a subsequent hearing on appeal. Oliver now brings suit against UTSW and two UTSW personnel involved in the disciplinary process alleging: (1) due process claims against all Defendants under 42 U.S.C. § 1983 and the Texas Constitution; (2) gender discrimination in violation of Title IX against UTSW; and (3) First Amendment retaliation against all Defendants. Oliver argues, among other things, that UTSW's disciplinary process lacked the requisite procedural due process safeguards based on the unique circumstances of his case and showed a gender bias against him, which ultimately rendered his expulsion unconstitutional. Defendants in turn seek dismissal of all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) arguing that Oliver's claims are either barred from suit by qualified

immunity or the Eleventh Amendment, or that Oliver failed to plead sufficient facts to support his claims. Having been fully briefed, and for the reasons below, the Court **GRANTS in part, DENIES in part, and DEFERS in part** Defendants' Motion to Dismiss under Rules 12(b)(1) and 12(b)(6).

## I.

## BACKGROUND[1]

This dispute arose after the University of Texas Southwestern Medical School (UTSW) expelled a former medical student and Plaintiff, Jacob Oliver, based on alleged violations of its code of conduct. Doc. 16, Am. Compl., ¶ 1.01. In August of 2013, Oliver moved onto UTSW's campus and began his studies to become a medical doctor. *Id.* ¶ 4.01. Oliver had just finished his second-year in medical school, was studying for his Step-1 examination, when his fiancée at the time, Elinor Rowan, called the UTSW Police Department (UTSWPD) and alleged that Oliver physically assaulted her at his apartment on May 18, 2016. *Id.* ¶¶ 4.20, 4.24(a)–4.24(b).[2] UTSW proceeded with an investigation into these allegations, which ultimately resulted in Oliver being expelled from school on June 27, 2016. *Id.* ¶ 4.30.

In order to understand the nature of Oliver's claims, a background into Oliver and Rowan's relationship and the events leading up to the alleged assault is necessary. Given that this case is at the motion-to-dismiss stage, the Court takes Oliver's allegations as true, which are as follows. In March of 2015, Oliver began dating Elinor Rowan, who then moved in with Oliver in August 2015.

---

[1]The Court draws its factual account from the Plaintiff's Amended Complaint (Doc. 16) as well as the parties' briefing on the Motion at issue.

[2] Oliver's Amended Complaint contains two paragraphs numbered 4.24, and thus, citation to 4.24(a) refers to the paragraph on pages 10–1 and 4.24(b) refers to the paragraph on page 11.

*Id.* ¶¶ 4.03, 4.12. Oliver alleges that throughout their relationship Rowan engaged in reckless driving causing her license to be revoked; drove under the influence; was a heavy drinker and took prescription-strength medicine, such as Adderall, without a prescription; and would lie about her work and school history. *Id.* ¶¶ 4.04–4.16. Because of these and other incidents, Oliver told Rowan on or about April 11–13, 2016, that if she did not stop drinking he could no longer be in a relationship with her. *Id.* ¶ 4.15. The couple then split up and Rowan moved out of the apartment. *Id.* Following the breakup, Oliver asked Rowan for the key to his apartment back, which she gave to him. *Id.* ¶ 4.16. However, Oliver still suspected that she had another copy of the key because on April 30, 2016, Oliver realized that his Adderall prescription along with any available refills were missing from his apartment. *Id.* ¶¶ 4.16–4.17. Oliver reported the prescription drugs missing to his doctor since it was a "schedule 2 controlled substance . . . and if it c[ame] up in the hands of someone else" he did not want to be held responsible. *Id.* ¶ 4.17.

On May 8, 2016, Rowan was pulled over on suspicion of drunk driving, her car was searched, and the police found Oliver's Adderall prescription in her car, and charged her with possession of a controlled substance. *Id.* ¶ 4.19. Oliver alleges that Rowan tried to get him to provide a false affidavit to corroborate the story she told the police—which was that Oliver had left the pills in the car—to get her off the charges. *Id.* ¶ 4.19–4.20. Oliver refused, so he alleges that with the aid of her parents she bought a "spy ware" device in order to surreptitiously record Oliver admitting that the pills were his and that she had not stolen them. *Id.* ¶¶ 4.20–4.21. Oliver states that on or about May 9–11, 2016, to accomplish this alleged scheme, Rowan began sending text messages to Oliver requesting to move back in with him, that she loved him, and that her parents kicked her out of the house so she needed a place to stay. *Id.* ¶ 4.20. Oliver obliged and allowed her to stay in the second

bedroom as a guest if she would not drink. *Id.* Rowan agreed and moved back into the apartment. *Id.* Shortly after moving back in, Oliver and Rowan had two separate altercations which form the basis of Rowan's assault allegations and led to Oliver being expelled from UTSW.

Incident #1: On May 17, 2016, Oliver communicated with Rowan's criminal defense attorney regarding him potentially signing a false affidavit that would help Rowan's case. *Id.* ¶ 4.22. Ultimately, Oliver told Rowan and her attorney that day that he would not be able to do so because it would put his career at risk. *Id.* Rowan returned to the apartment around midnight, highly intoxicated and on prescription drugs, and the two began having a verbal altercation. *Id.* While intoxicated, Rowan then stated she was going to leave and refused to give Oliver her car keys. *Id.* Fearing what might happen to her or others if she drove in a drunken state, Oliver then partially deflated Rowan's right rear tire. *Id.* Rowan then ran away for some time, but eventually returned to the apartment that night and went to bed. *Id.*

Incident #2: On May 18, 2016, Rowan again returned from work around midnight in an intoxicated state and the couple began arguing. *Id.* ¶ 4.24(a). Rowan allegedly "yanked" Oliver's computer off the desk while he was working on it and attempted to leave the apartment with it. *Id.* While Rowan was attempting to leave with his computer, Oliver closed the door and tried to "yank" the computer back. *Id.* Rowan pulled back and dropped the computer as she fell backward toward the door. *Id.* Oliver alleges that at one point in the altercation Rowan also stumbled over a vacuum that was behind her. *Id.* Oliver then asked Rowan if she was okay because she had fallen at her workplace the week before and bruised her tailbone. *Id.* Also during the altercation, Oliver was puzzled that Rowan asked him to hit her and kept on saying to "stop" or that he was hurting her. *Id.* ¶ 4.24(a). Oliver later learned that Rowan had been secretly recording the conversations and

believes that is why she made those remarks. *Id.* Oliver alleges that besides trying to pull the computer from her, he did not hit Rowan. *Id.* ¶ 4.26. The altercation ended with Oliver going to his mother's home to study and Rowan sleeping at Oliver's apartment. *Id.* ¶ 4.24(a).

Early the next morning on May 19, 2016, Oliver texted Rowan with continued concerns about her possession charges. *Id.* ¶ 4.24(b). Later that afternoon, Rowan called the UTSWPD to report an allegation of assault against Oliver. *Id.* That information was then communicated to UTSW because on May 20, 2016, Oliver received an email from Defendant Dr. Angela Mihalic, Associate Dean for Student Affairs at UTSW, advising Oliver of the claims against him. *Id.* Oliver called Mihalic and an interview was scheduled for May 23, 2016, and she advised him to get an attorney to assist in responding to the school misconduct and criminal charges. *Id.* At the interview, Oliver and his former roommate, Dr. Ben Shahabi, met with Mihalic where Oliver admitted that there had been a verbal altercation between him and Rowan, but that no physical assault had occurred at anytime in their relationship. *Id.* ¶ 4.26. Oliver's former roommate also provided testimony to Mihalic that called into question Rowan's credibility and substance abuse issues, and Oliver explained his motives behind letting the air out of Rowan's tire and fighting over the computer—i.e., that he did not want her to drink and drive and the computer was his so he was defending his property. *Id.* ¶¶ 4.26, 5.09, 6.10. Based on Mihalic's investigation to that point, she determined there was insufficient evidence to proceed with any misconduct charges against Oliver and dropped the charges on May 25, 2016. *Id.* ¶ 4.28; Doc. 27-1, Notice of Disciplinary Action, 1–2.

Subsequently, Oliver received a Notice of Disciplinary Action letter on June 27, 2016, from Mihalic, stating that UTSW obtained new information and evidence regarding the alleged altercation, and that Oliver was expelled from medical school effective immediately. Doc. 16, Am.

Compl., ¶ 4.30; Doc. 27-1, Notice of Disciplinary Action, 1–2. Mihalic described the newly-obtained evidence as statements Rowan made to UTSW Police, an audio recording of the altercation, Oliver's UTSWPD's arrest record, and Rowan's filing of a protective order. Doc. 27-1, Notice of Disciplinary Action, 1. Based on this evidence, Oliver was found to have violated SEC-156 Violence on Campus and EDU-151 Student Conduct and Discipline rules, which prohibit students from engaging in conduct that endangers the health or safety of another person. *Id.* at 1–2.

On July 15, 2016, Oliver filed a Notice of Appeal defending against expulsion and a hearing was set for July 26, 2016, before Dr. Jon Williamson, Dean of the UTSW School of Health Professions. Doc. 16, Am. Compl., ¶ 4.31. At the hearing, Oliver objected that his due process rights were not being observed. *Id.* ¶ 4.32(a).[3] Williamson ultimately affirmed Mihalic's expulsion at the hearing, causing Oliver to be permanently expelled from medical school. *Id.*

Following his expulsion, the criminal charges investigated by UTSWPD proceeded. *Id.* ¶ 4.32(b). Through that investigation, Oliver's defense attorney hired an expert to examine the audio recording device Rowan used, which ultimately revealed that the audio recordings were doctored to support Rowan's claim that Oliver assaulted her. *Id.* Upon the recovery of the deleted audio files, the district attorney agreed to drop the charges against Oliver on condition that he complete an "anger management" course. *Id.* ¶ 4.33. Also, related civil proceedings regarding a protective order Rowan filed against Oliver resulted in the revelation of colored photographs of her bruises, which were also inconsistent with the alleged time or cause of the injury. *Id.* ¶ 4.35.

On June 14, 2018, Oliver filed suit against UTSW and Mihalic and Williamson for their

---

[3] Oliver's Amended Complaint also contains two paragraphs numbered 4.32, and thus, citation to 4.32(a) refers to the paragraph on page 14 and 4.32(b) refers to the paragraph on page 14–15.

involvement in his expulsion. *See* Doc. 1, Compl. Then, on September 4, 2018, Oliver filed his Amended Complaint against the same Defendants alleging: (1) due process claims against all Defendants under 42 U.S.C. § 1983 and the Texas Constitution; (2) gender discrimination in violation of Title IX against UTSW; and (3) First Amendment retaliation against all Defendants. *See* Doc. 16, Am. Compl. Oliver seeks both money damages and prospective injunctive relief. *Id.* at 28. In sum, he seeks damages for past and future lost earnings and benefits as a result of his expulsion and inability to pursue a medical career, past and future pecuniary losses, an injunction ordering Oliver to be reinstated pending a full rehearing of the charges against him, an order clearing his transcript of all mention of charges against him, as well as attorneys' fees and costs. *Id.* In response to these claims, Defendants moved to dismiss Oliver's claims under Rules 12(b)(1) and 12(b)(6) arguing that Oliver's claims are either barred from suit by qualified immunity or the Eleventh Amendment, or that Oliver failed to plead sufficient facts to support his claims. Doc. 24, Defs.' Mot. to Dismiss, 1–2. Plaintiff filed his Response (Doc. 27) to Defendants' Motion, and Defendants filed their Reply (Doc. 28). Defendants' Motion is therefore ripe for the Court's review.

## II.

### DISMISSAL UNDER RULE 12(b)(1)

Because the Fifth Circuit has instructed courts to first address jurisdictional arguments before any attack on the merits, the Court will begin with Defendants' arguments under Rule 12(b)(1). *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam); *see also Crenshaw–Logal v. City of Abilene, Tex.*, 436 F. App'x 306, 308 (5th Cir. 2011) ( holding that if a claim could be dismissed on both jurisdiction and failure to state a claim, "the court should dismiss only on the jurisdictional ground under 12(b)(1), without reaching the question of failure to state a claim").

A.      *12(b)(1) Legal Standard*

"'Federal courts are courts of limited jurisdiction.'" *MacKenzie v. Castro*, 2016 WL 3906084, at *2 (N.D. Tex. July 19, 2016) (quoting *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998)). For that reason, they can adjudicate claims only when subject matter jurisdiction "is expressly conferred by the Constitution and federal statute." *Armstrong v. Tygart*, 886 F. Supp. 2d 572, 584 (W.D. Tex. 2012). And Federal Rule of Civil Procedure 12(b)(1) provides the vehicle through which a party may challenge that jurisdiction. *Id.* Arguments involving a sovereign-immunity defense under the Eleventh Amendment or whether a defendant is a "person" within the meaning of Section 1983 are both issues of subject matter jurisdiction, and thus can be contested by a Rule 12(b)(1) motion to dismiss. *See Jackson v. Tex. S. Univ.*, 2013 WL 593412, at *5–6 (S.D. Tex. Feb. 14, 2013).

"A Rule 12(b)(1) motion can mount either a facial or factual challenge." *MacKenzie*, 2016 WL 3906084, at *2. A facial challenge occurs "[w]hen a party files a Rule 12(b)(1) motion without including evidence." *Id.* A factual challenge, by contrast, occurs when a party supports its Rule 12(b)(1) motion with evidence. *Id.* In both cases, the burden of proof "'is on the party asserting jurisdiction.'" *Id.* (quoting *Ramming*, 281 F.3d at 161). So Plaintiff must prove jurisdiction exists. Here, Defendants filed their Rule 12(b)(1) motion without any additional evidence, so it is considered a facial attack. Thus, the Court considers just the sufficiency of "the allegations in the complaint because they are presumed to be true." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). And "[i]f those jurisdictional allegations are sufficient, the complaint stands." *Id.*

B.      *Due Process Claims Brought Under the Texas Constitution*

Oliver brings due process claims against UTSW and its two employees under the Texas

Constitution. Doc. 16, Am. Compl., ¶ 6.02. In their Motion, Defendants argue that all claims brought under the Texas Constitution are barred by Eleventh Amendment Immunity. Doc. 24, Defs.' Mot. to Dismiss, 10–11. Oliver concedes this argument. *See* Doc. 27-4, Proposed Order, 1 (stating that the Court should dismiss his claims under the Texas Constitution). As a matter of law, the Court agrees with Defendants.

"The Eleventh Amendment bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002). "For purposes of the Eleventh Amendment immunity, a suit against a state university is a suit against the state." *Jackson*, 2013 WL 593412, at *4 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)). Moreover, "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the state that is protected by the Eleventh Amendment. State law claims brought against state officials in federal court, including claims brought under pendent jurisdiction, are barred by Eleventh Amendment immunity." *Beleno v. Lakey*, 306 F. Supp. 3d 930, 940 (W.D. Tex. 2009) (citing *Pennhurst*, 465 U.S. at 121). Therefore, based on the facts alleged, the Court finds that all of Oliver's Texas constitutional due process claims brought against all Defendants are barred by the Eleventh Amendment, and thus the Court **DISMISSES** these claims for a lack of subject matter jurisdiction.

C.    *Due Process Claims Brought Under Section 1983*

Oliver also brings due process claims under Section 1983 against UTSW and its two employees involved in his expulsion from medical school. Doc. 16, Am. Compl., ¶ 6.02. Oliver seeks damages and prospective injunctive relief. *Id.* at 28.

"Section 1983 provides a private right of action for damages to individuals who are deprived of 'any rights, privileges, or immunities' protected by the Constitution or federal law by any 'person' acting under the color of state law." *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007) (quoting 42 U.S.C. § 1983). The Fifth Circuit has recognized "that state universities as arms of the state are not 'persons' under § 1983." *Id.* Therefore, Oliver's Section 1983 claims against UTSW fail as a matter of law because UTSW is not a "person" liable under the statute.

With regard to the two UTSW employees' liability under Section 1983, the Supreme Court in *Will v. Michigan State Department of Police*, restated the rule that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office[, which] . . . is no different from a suit against the State itself." 491 U.S. 58, 71 (1989). Despite this distinction, the Court reaffirmed that "a state official in his or her official capacity, when sued for *injunctive relief*, would [still] be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* 71 & n.10 (emphasis added) (citing *Ex parte Young*, 209 U.S. 123, 159–160 (1908)) . Thus, as further discussed below, Oliver's Section 1983 claims may proceed against the two UTSW employees in their official capacities for prospective injunctive relief and in their individual capacities for damages. Therefore, the Court **DISMISSES** Oliver's Section 1983 claims against UTSW and against the two UTSW employees in their official capacities for damages.

## III.

## DISMISSAL UNDER RULE 12(b)(6)

Defendants next seek dismissal of the remainder of Oliver's claims under Rule 12(b)(6). First, with regard to Oliver's Section 1983 due process claims against the two UTSW employees,

Defendants argue that the claims are barred by qualified immunity, or in the alternative, fail because Oliver was afforded the requisite due process. Second, with regard to Oliver's Title IX gender discrimination claim against all Defendants, Defendants argue that he has not pled sufficient facts to show that his gender was a motivating factor in their decision to expel him. And lastly, with regard to Oliver's First Amendment retaliation claim against all Defendants, Defendants argue that he fails to show that he was engaged in constitutionally protected speech and that chilling his protected speech was a substantial or motivating factor in Defendants' decision to expel him.

A.      *12(b)(6) Legal Standard*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." *Id.* 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

B.     *Section 1983 Claims*

First, the Court reviews Oliver claim that in expelling him from medical school, Defendants[4] acting in both their official and individual capacities violated his procedural and substantive[5] due process rights provided by the Fourteenth Amendment. Doc. 16, Am. Compl., ¶¶ 6.01–6.11, 8.01–8.08. Defendants argue that the Section 1983 claims against the two UTSW employees are barred by qualified immunity or fail because Oliver was afforded the requisite due process. Doc. 24, Defs.' Mot. to Dismiss, 2.

"To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521,

---

[4] As discussed above, Oliver's Section 1983 claims may only proceed against the two UTSW employees in their official capacities for injunctive relief and in their individual capacities for damages. *See* discussion *supra* Section II.C. Thus, any reference to "Defendants" refers only to Mihalic and Williamson.

[5] In his Amended Complaint, Oliver contends that Defendants violated his substantive due process rights when they expelled him from medical school. Doc. 16, Am. Compl., ¶ 6.02. Oliver, however, never raises the standard for what constitutes a violation of substantive due process in his Amended Complaint or in briefing on this Motion. In fact, Oliver's only mention of substantive due process in his Complaint is when he states in a conclusory fashion that "he was denied . . . substantive due process." *Id.* ¶ 6.02. And the remainder of his Complaint or his Response to this Motion to Dismiss contains no allegations supporting this claim, but instead focuses on his procedural due process claim. *See id.* ¶¶ 6.02–6.11; *see also* Doc. 27, Pl.'s Resp. Thus, the Court considers Oliver's substantive due process claim abandoned and **DISMISSES** it. *See Papin v. Univ. of Miss. Med. Ctr.*, 2018 WL 4685471, at *3 & n.22 (S.D. Miss. Sept. 28, 2018) (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("[The] failure to pursue this claim beyond [the] complaint constitute[s] abandonment.").

525 (5th Cir. 1994). Here, the parties do not dispute that Mihalic and Williamson were acting under the color of state law. But Oliver "must [still] plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 U.S. at 676.[6]

However, with regard to Section 1983 suits against government officials in their individual capacities, qualified immunity serves as an affirmative defense that shields officials from liability "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370–71 (5th Cir. 2011) (en banc). Qualified immunity shields government officials only from money damages in their individual capacities, not suits for injunctive relief in their official capacities. *See id.* at 401. A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Courts have discretion in deciding which of the two qualified immunity prongs should be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because Oliver must adequately plead a constitutional violation to overcome the two UTSW employees' qualified immunity defense in their individual capacities and to establish that they are liable in their official capacities, the Court will first address whether Oliver has adequately plead a procedural due process violation against Mihalic and

---

[6] Defendants argue that Oliver has failed to make any allegations of specific conduct by Williamson and that on this ground alone, Williamson should be dismissed. Doc. 24, Defs.' Mot. to Dismiss, 13 & n.4. The Court is not persuaded by this argument because based on its review of the Amended Complaint in the light most favorable to Oliver, the Court finds sufficient detail of individual actions or inactions allegedly attributable to Williamson, and which Oliver claims violate the Constitution. *See* Doc. 16, Am. Compl., ¶¶ 4.31–4.32(b), 5.11; *see also* Doc. 27, Pl.'s Resp., 20–21.

Williamson in both their official and individual capacities. Then the Court will discuss whether that right was "clearly established," and thus determine the issue of whether qualified immunity applies in this case to shield Mihalic and Williamson from suit in their individual capacities.

1.     Was There a Violation of a Constitutional Right?

The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. The Fourteenth Amendment protects both procedural and substantive due process. Procedural due process ensures that state actors utilize the required and fair procedures before they can deprive someone of a life, liberty, or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Thus, a prerequisite to stating a procedural due process claim is that a life, liberty, or property interest be at stake. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569–71 (1972). Therefore, the Court will first discuss whether Oliver has a life, liberty, or property interest at stake before proceeding to whether his procedural due process rights were violated.

a.     Protected Interests

Oliver claims that he had a protected *liberty* interest in pursuing his public medical school education. Doc. 16, Am. Compl., ¶ 6.02. Moreover, Oliver claims that Defendants' refusal to relinquish his transcript after his expulsion permanently barred him from pursuing a medical education at any institution and damaged his reputation. *See id.* ¶¶ 4.32(a), 6.11. And lastly, his expulsion and non student status required him to vacate his apartment on campus and forfeit his student health benefits. *See id.* ¶ 4.30. The Supreme Court has not explicitly recognized a liberty or property interest in a student's continued enrollment in a public college or university or in his or her reputation resulting from a unconstitutional disciplinary process. Instead, in cases where the

purported interests are at stake, courts have assumed that a liberty interest exists, and then gone on to find that the process at issue was constitutionally adequate.[7] However, in this case the Court cannot take this approach because, as explained below, the Court finds that Oliver has alleged sufficient facts to state that process was not constitutionally adequate. Thus, the Court may not simply assume, but instead must determine whether Oliver sufficiently alleges a liberty interest. This Court joins the Fifth Circuit in finding that in circumstances, like those here, a liberty interest exists.

In *Than*, the Texas Supreme Court found that a medical student charged with academic dishonesty had a protected liberty interest under the Texas Constitution in pursuing a public medical education because of the damage to his reputation and loss of his chosen profession. 901 S.W.2d at 930. Originally, the Fifth Circuit had considered, but refused to adopt *Than* in a case involving a medical student dismissed from her residency program based on her fitness to perform as a doctor. *Shaboon v. Duncan*, 252 F.3d 722, 729–731 (5th Cir. 2001). The *Shaboon* court refused to follow *Than* for several reasons, one of which was that *Than* involved a student dismissed for misconduct violations (cheating on an exam), where the medical resident in *Shaboon* was dismissed for academic reasons. *Id.* at 730. However, the court in *Shaboon* opined that *Than* might be persuasive in cases involving student dismissals for misconduct, which as will be discussed below, is the case here. *See id.* Later , in a case involving college students expelled for sexual misconduct, the Fifth Circuit adopted the ruling from *Than*, and found that students do in fact have a liberty interest in their

---

[7] *See E.g.*, *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985) (assuming a "constitutionally protectable property right . . . in continued enrollment"); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978) (assuming a liberty or property interest in continuing a medical education); *Smith v. Davis*, 507 F. App'x 359, 362–63 (5th Cir. 2013) (collecting cases); *but see Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) (citing *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 930 (Tex. 1995) and holding that "[students] have a liberty interest in their higher education").

higher education. *Plummer*, 860 F.3d at 773 (citing *Than*, 901 S.W.2d at 930). Moreover, even as early as 1961, the Fifth Circuit held that students expelled from a state university for misconduct have an interest in continuing education in good standing that is entitled to due process. *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961) ("The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing."); *see also Plummer*, 860 F.3d at 781 & n.8 (J. Jones dissenting) (citing several other federal courts around the country that "have relied on *Dixon* for the proposition that protected interests are implicated by university suspensions and expulsions" and noting that recent Fifth Circuit cases have overlooked *Dixon*). And district court decisions from this circuit even before *Plummer* have recognized that students have a liberty interest in higher education. *See, e.g.*, *O'Neal v. Alamo Cmty. Coll. Dist.*, 2010 WL 376602, at * 7 & 7 n.2 (W.D. Tex. Jan. 27, 2010) (citing *Dixon* and *Than* in finding that the plaintiff had a liberty interest in higher education).

Additionally, the Court finds that there is a reputational interest at stake in this case. Specifically, Defendants' actions impede on Oliver's career goals and his reputation, which although not a liberty or property interest, still require minimal due process protections. In Oliver's case, the effect of his expulsion was not only to bar his attendance at UTSW, but also to prevent him from pursuing a career as a doctor because of UTSW's alleged failure to release his transcript—an allegation that Defendants do not refute and that the Court must accept as true at this stage. Doc. 16, Am. Compl., ¶ 4.32(a). Second, although "reputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause[,]" *Paul v. Davis*, 424 U.S. 693, 701 (1976), the Supreme Court has recognized that "[w]here a person's good name, reputation, honor, or integrity

is at stake because of what the government is doing to him, the *minimal requirements* of the [Due Process] Clause must be satisfied." *Goss v. Lopez*, 419 U.S. 565, 575 (1975) (emphasis added). Here, Oliver's professional reputation is at stake because UTSW expelled him from medical school for violating the school's code of conduct, and the reason of dismissal is publicized on his transcript. *See* Doc. 16, Am. Compl., 28 (requesting an order that Oliver's transcript be cleared of all mention of the charges against him); *cf. Horowitz*, 435 U.S. at 83 (noting that the Court "rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty").

Therefore, because the Court finds that Oliver has a liberty interest in his higher education, and that the harm to his reputation and inability to pursue a career as a doctor entitles him to procedural due process protections, the questions become, what procedural due process was required and was Oliver afforded that process.

b.      *Procedural Due Process*

Now, the Court will discuss whether Mihalic and Williamson, acting in their official and individual capacities, complied with the necessary procedural due process mechanisms required in this case. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews*, 424 U.S. at 332. But procedural due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances[;]" instead, it "is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 333–34 (internal alterations omitted). Thus, to determine what standard is required, courts consider and weigh the *Mathews* factors: (1) "the private interest that will be

affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

More specifically, for cases such as Oliver's involving disciplinary procedures in the educational context, the amount of due process required depends on where a plaintiff falls on two sliding scales—one based on the severity of conduct at issue (failure to meet academic standards v. academic dishonesty or other misconduct) and the second based on the severity of the sanction (temporary suspensions v. permanent expulsions). For example, in a case involving the temporary suspension of high-school students for misconduct, the Supreme Court held that the Fourteenth Amendment required that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 575–76, 581. The *Goss* Court specified, however, that "[l]onger suspensions or *expulsions* for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584 (emphasis added). Also, in a case deciding whether a medical student dismissed for failing to meet academic standards was entitled to due process, the Supreme Court reaffirmed that the student was entitled to limited due-process protections in the form of "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Horowitz*, 435 U.S. at 86 (quoting *Goss*, 419 U.S. at 584). However, the Court noted that there is a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct[,] . . . [which] calls for far less

stringent procedural requirements in the case of an academic dismissal." *Id.* at 86 & n.3.

Thus, the Court must determine where Oliver's case fits on these two sliding scales. Here, unlike the students in *Goss*, Oliver was permanently expelled, and unlike the medical student in *Horowitz*, Oliver was expelled for violating UTSW's codes of conduct. Although these cases are not factually similar to Oliver's case, they are still instructive on what the *minimum* due process requirements are. This is because both of these differences in Oliver's case—(1) permanent expulsion for (2) misconduct violations—mitigate towards employing a more formalized and stringent process than what the Supreme Court held was required in *Goss* or *Horiwitz. See Goss*, 419 U.S. at 584; *see also Horowitz*, 435 U.S. at 86 & n.3.

Oliver argues that the two UTSW employees, acting in their official and individual capacities, failed to afford him the procedural due process he was owed by: (1) expelling him in part based on a doctored audio tape and other evidence such as color photographs and written statements presented by Rowan, without providing the evidence to Oliver or allowing him to respond; (2) considering a police report, which Oliver argues was entirely hearsay; (3) not requiring Rowan to testify at the appeals hearing or allowing Oliver to cross-examine her; and (4) failing to consider Oliver's protection of property defense and evidence that he owned the computer at the center of the altercation. Doc. 16, Am. Compl., ¶¶ 6.05–6.10; Doc. 27, Pl.'s Resp., 25–26. Defendants counter that all of the procedural shortcomings Oliver points to are immaterial in this case and that Oliver received adequate due process because: (1) Oliver and his former roommate met with Mihalic and told tell their side of the story after the initial report of misconduct; (2) Oliver received an email from Mihalic notifying him of his expulsion and explaining the charges and evidence against him; and (3) the school allowed him to request a disciplinary hearing, which he did, where he could present

witnesses, cross-examine witnesses, and present argument for why his charges should be dropped. Doc. 24, Defs.' Mot. to Dismiss, 19–22.

For purposes of this Order, the Court focuses on Mihalic and Williamson's failure to disclose the incriminating evidence against Oliver as well as Williamson's failure to require Rowan to testify at the hearing. Ultimately, the Court finds that Oliver has pled enough facts to show that Mihalic failed to abide by the minimum procedural due process constraints established in *Goss* and *Horowitz*, and that Williamson failed to abide by the more stringent processes required in Oliver's circumstances based on relevant case law and the *Mathews* factors. The Court will first address the procedural due process claim as to Mihalic before addressing the claim as to Williamson.

i.      Allegations Against Mihalic: Initial Investigation & Expulsion

First, the Court finds that the internal investigation conducted by Mihalic and her subsequent letter to Oliver notifying him of his expulsion failed to meet even the minimal due-process requirement of providing "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *See Horowitz*, 435 U.S. at 86 (quoting *Goss*, 419 U.S. at 584). On May 20, 2016, Mihalic began an investigation into Oliver based on assault allegations made by Rowan to UTSWPD and subsequently communicated to school officials. Doc. 16, Am. Compl., ¶ 4.24(b). Then, on May 23, 2016, Oliver and his former roommate met with Mihalic where Oliver admitted that there had been a verbal altercation between him and Rowan, but that no physical assault had occurred at anytime in their relationship. *Id.* ¶ 4.26. Furthermore, Oliver's former roommate, Shahabi, provided testimony to Mihalic that called into question Rowan's credibility and substance abuse issues, and Oliver explained his motives behind

letting the air out of Rowan's tires and fighting over his computer. *Id.* ¶¶ 4.26, 5.09, 6.10. Based on Mihalic's investigation to that point, she determined that there was insufficient evidence to proceed with any misconduct charges against Oliver and dropped the charges on May 25, 2016. *Id.* ¶ 4.28.

Subsequently, after a month of no contact between Oliver and UTSW school officials[8] regarding these charges, Oliver received a Notice of Disciplinary Action letter on June 27, 2016, from Mihalic, stating that UTSW obtained new information and evidence regarding the alleged altercation, and that Oliver was expelled from medical school effective immediately. *See id.* ¶ 4.30; *see also* Doc. 27-1, Notice of Disciplinary Action, 1–2. In the letter, Mihalic described the newly obtained evidence as statements Rowan made to UTSW Police, an audio recording of the altercation, Oliver's UTSW Police arrest record, and Rowan's filing of a protective order. *Id.*

Oliver argues that being summarily suspended by Mihalic, based on new evidence not previously disclosed to him, and without giving him the opportunity to respond, violated his due process rights. Doc. 16, Am. Compl., ¶ 4.30. Defendants respond that Oliver has not and cannot allege that the decision to expel him was based on the newly obtained evidence and that Mihalic's actions complied with due process. Doc. 24, Def.'s Mot. to Dismiss, 18–19.

---

[8] At the same time that UTSW school officials were investigating Oliver, UTSW Police were also investigating criminal charges against Oliver since Rowan had originally complained of the alleged assault to the police. Doc. 16, Am. Compl., ¶¶ 4.24(b), 4.29. Oliver alleges that as a part of this investigation he and his attorney met with two officers on June 14, 2016, where he was interviewed and provided with "heavily edited audio clips from Rowan and her parents." *Id.* ¶ 4.29. At that time, Oliver allegedly refused to further participate in the interview until the full audio recording was released. *Id.* Oliver claims that the officers denied his request and instead arrested Oliver pursuant to a June 7, 2016 arrest warrant. *Id.* The Court notes that although Oliver knew at that time that the police had portions of the audio recording, Oliver alleges that he was not aware that the school was also in possession of it until Mihalic's June 27, 2017 email. *See id.* ¶ 4.30. The full audio recording was only released after he was expelled from UTSW, when Oliver and his attorney were able to subpoena the device as a part of the criminal case. *Id.* ¶ 4.32(b). The criminal charges against Oliver were ultimately dropped once the full audio recording was revealed. *Id.* ¶ 5.05.

The Court finds Defendants' argument specious. Although Oliver cannot allege what specific evidence Mihalic ultimately relied on, the Court can assume at this stage that it was based in part on the newly obtained evidence since it was not until Mihalic received the new evidence that she decided to expel Oliver. *See* Doc. 27-1, Notice of Disciplinary Action, 1–2 (listing the new evidence received and concluding Oliver was in violation of the school's policies). The constitutional concern with this procedure is that Mihalic expelled Oliver *before* presenting the evidence to him and allowing him to explain his side of the story in light of this new evidence. *See Dixon*, 294 F.2d at 158 ("due process requires notice and some opportunity for hearing *before* a student at a tax-supported college is expelled for misconduct.") (emphasis added).

ii.     Allegations Against Williamson: Affirming Expulsion on Appeal

Second, the Court finds that the subsequent appellate hearing held before Williamson, the Dean of UTSW, failed to cure the procedural defects that occurred in Mihalic's investigation and subsequent expulsion. Notably, at this stage of the case, the record of what occurred prior to or at the hearing is incomplete, which limits the Court's ability to determine whether Oliver was given sufficient due process.[9] However, at this stage of litigation, interpreting Oliver's well-pleaded facts regarding the hearing in the light most favorable to him, the Court finds that the hearing did not cure any of the procedural defects. The reason is that the hearing essentially rubber-stamped Mihalic's investigatory findings, was not a *de novo* review of the expulsion on the merits, and relied

---

[9] The second factor in the balancing test established in *Mathews* requires courts to weigh "the risk of an erroneous deprivation of such interest through the *procedures used*, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 332 (emphasis added). However, as explained below it is unclear what actually occurred at the hearing, thus, the Court is limited in its analysis and must rely on Oliver's allegations of what occurred.

on the same evidence to which Oliver had no opportunity to respond in the initial investigation and that was still not turned over to him prior to or at the hearing.[10] *See Than*, 901 S.W. 2d 933 (holding that while "post-deprivation de novo proceedings may cure defects in the initial process, it is less clear the extent to which ordinary appellate review can cure initial procedural defects").

Defendants argue that Oliver had several procedural tools at his disposal at the hearing—e.g., calling witnesses, cross-examining witnesses, introducing evidence, and presenting argument—however, in practice, the hearing lacked the procedural mechanisms that could cure the deficiencies that existed in Mihalic's initial investigation.[11] *See* Doc. 24, Defs.' Mot. to Dismiss, 20. For example, Defendants state that Mihalic provided Oliver with the exhibits and list of witnesses she planned to present at the hearing, but they do not state what exact evidence or testimony was presented. *See id.* And, based on Oliver's allegations, it appears that UTSW did not present any witnesses to the alleged assault for Oliver to effectively cross-examine such as Rowan, nor did UTSW

---

[10] In a footnote in their Reply, Defendants state that Oliver received a copy of the complete police report, which contained the photographs of Rowan's bruised arms. Doc. 28, Def.'s Reply, 6 n.1. However, Defendants do not state when Oliver received that report or whether the photographs were in color. Regardless, Oliver states in his Complaint that the colored photographs were only produced to him in a subsequent civil proceeding, Doc. 16, Am. Compl., ¶ 4.35, which at this stage, the Court must accept as true.

[11] Defendants cite two cases in arguing that because Oliver voluntarily refused to participate in the hearing, he cannot now argue that he was denied procedural due process. Doc. 24, Defs.' Mot. to Dismiss, 22 (citing *Rathjen v. Litchfield*, 878 F.2d 836, 839–40 (5th Cir. 1989); *Galloway v. State of La.*, 817 F.2d 1154, 1158 (5th Cir. 1987)). The Court however is not persuaded by this argument for two reasons. First, in both cases the terminated employees completely failed to pursue or even request post-deprivation remedies. *See Rathjen*, 878 F.3d at 839 (employee failed to request a known grievance procedure); *Galloway*, 817 F.2d at 1158 (same). Instead, here, Oliver filed a Notice of Appeal requesting a hearing before Williamson, appeared at the hearing, and objected that his due process rights were not observed. Doc. 16, Am. Compl., ¶¶ 4.31–4.32(a). Thus, it cannot be said that Oliver "ignore[d] the process duly extended to him and later complain[ed] that he was not accorded due process." *Galloway*, 817 F.2d at 1158. Second, and more importantly, Oliver's lack of substantive participation in the hearing is inconsequential since the due-process violation occurred prior to the hearing and after he was expelled by Mihalic when UTSW failed to turn over the evidence it had because it limited his ability to meaningfully respond to the allegations against him.

present key evidence, such as the audio files or copies of color photographs of the bruises. Doc. 16, Am. Compl., ¶ 4.32(a). The Court recognizes that neither the Supreme Court nor the Fifth Circuit has explicitly required any one of these procedures. But taken together, the allegations show Oliver was not afforded sufficient procedural mechanisms in light of the facts and circumstances of this case and what he stood to lose.

Defendants further argue that there is no legal authority for the proposition that a student in a disciplinary proceeding is entitled to have the actual records introduced into evidence as opposed to testimony describing those records. Doc. 24, Defs.' Mot. to Dismiss, 20 (citing *Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 534, 545–56 (W.D. La. 2016)). However, that is not the end of the Court's inquiry in this case because "[t]he requisite elements of procedural due process are not wooden absolutes applicable to each case regardless of circumstances." *U.S. v. Richardson Indep. Sch. Dist.*, 483 F.Supp. 80, 85 (N.D. Tex. 1979).

Instead, the Court must apply the *Mathews* factors to determine what procedural standard is required in light of the circumstances of this case. In other words, whether the probable value of either allowing Oliver access to this evidence or requiring Rowan to testify, together with his interest in attaining his medical degree and protecting his reputation, outweighed the burden that would be placed on UTSW by allowing him to inspect and respond to the evidence or Rowan's testimony. *See Mathews*, 424 U.S. at 335.

Here, the first and third *Mathews* factors are easily identified.[12] As previously discussed,

---

[12] To reiterate, those factors are "the private interest that will be affected by the official action" weighed against "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Oliver's liberty interest in continuing his medical education and preserving his good name was substantial. *See* discussion *supra* Section III.B.1.a (Protected Interests). "On the other hand, [UTSW] has a strong interest in the 'educational process,' including maintaining a safe learning environment for all its students, while preserving its limited administrative resources." *Plummer*, 860 F.3d at 773 (citing *Goss*, 419 U.S. at 580, 583). However, the administrative burdens of requiring UTSW to turn over the audio files, color photographs, and any other evidence it had in its possession and relied on in expelling Oliver is minimal to non-existent.

Applying the second *Mathews* factor—the risk of erroneously depriving Oliver's interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards—the unique facts of this case show how detrimental UTSW's failure to release this evidence or provide other procedural mechanisms could have been to Oliver's case. Here, Oliver and his former roommate had already met with Mihalic prior to the school being in possession of the audio clip and photos, at which time they stated that Rowan had a history of deception and substance-abuse issues. Doc. 16, Am. Compl., ¶ 4.26. Also, even though in that meeting Oliver admitted to arguing with Rowan, he denied that there had been any physical assault. *Id.* Thus, there were significant factual disputes over what exactly transpired in Oliver's apartment on May 18, 2016, and UTSW, through its employee Mihalic, had reason to question Rowan's credibility and motives in reporting Oliver to school police. In fact, in this initial investigation Mihalic determined the evidence was insufficient to find any wrongdoing. Doc. 27-1, Notice of Disciplinary Action, 1. Case law from other courts applying the *Mathews* factors in student disciplinary cases supports the proposition that given Mihalic's failure to disclose the evidence, Williamson should have turned over the evidence he had against Oliver or required Rowan to testify in order for the due process violation

to have been cured.

For example, Oliver's case is unlike *Plummer* in which the district court and the Fifth Circuit found that a university had provided adequate due process for two students who were expelled from college for sexual-misconduct allegations. 2015 WL 12734039 (S.D. Tex. May 28, 2015), *aff'd,* 860 F.3d 767 (5th Cir. 2017). The Fifth Circuit found that because the university had in its possession a video—whose authenticity was not materially disputed even after the students were presented with it and allowed multiple opportunities to challenge it—that clearly showed the two students engaging in the graphic conduct they were charged with, it was "unnecessary that [the court] draw any determinative line regarding sufficient procedures in state university disciplinary cases." *Plummer*, 860 F.3d at 774, 776, 776 n.10; *see also Plummer*, 2015 WL 12734039, at *13 (district court noted that the students were able to "view and respond to the videos and other evidence used in the course of investigation"). The Fifth Circuit found that determining whether confrontation and cross-examination of the accuser should have occurred was not necessary because the university "did not rely on testimonial evidence from [the accuser] . . . nor that such testimony could have otherwise altered the impact of the videos and photo." *Plummer*, 860 F.3d at 775–76.

Similar to the line of reasoning in *Plummer*, the district court in *Pham* found—in a case of a pharmacy student expelled for cheating—that the school was not required to introduce actual exam records at the initial hearing or appeal since (1) at the hearing the student was able to question witnesses that testified to the substance of those records and (2) those witnesses actually witnessed the cheating. *Pham*, 194 F. Supp. 3d at 545. Thus, underlying the court's ruling in *Pham* was the fact that two professors that testified at his initial hearing saw the student cheat on the exam, and therefore, introduction of actual evidence was not as crucial. *See id.* at 541–42.

And lastly, in *Flaim v. Medical College of Ohio*, the Sixth Circuit found that because the student's expulsion from medical school "was based on an already adjudicated felony conviction[,] [i]t was not a case involving factual disputes where many of the additional procedures would be helpful in determining 'whether the misconduct [such as cheating] has occurred.'" 418 F.3d 629, 643 & n.8 (6th Cir. 2005). The Sixth Circuit went on to "strongly emphasize that a disciplinary hearing involving a record of conviction is wholly different from a case involving disputes of fact, even if the university believes the evidence to be overwhelming." *Id.* at 643 n.7.

Reading *Plummer*, *Pham*, and *Flaim* together, as well as guided by the factors in *Mathews*, these cases support the proposition that in cases, such as this one, where there are significant factual disputes over whether the alleged misconduct occurred, additional procedural safeguards may be required such as presentation of the actual incriminating evidence, confrontation by adverse witnesses, and perhaps cross-examination of those witnesses. And these additional safeguard are even more warranted in serious cases where a student is permanently expelled from medical school for claims of quasi-criminal conduct.

Here, unlike in *Plummer*, Oliver was never given a copy of the audio recording or colored photographs to inspect or respond to. Also, unlike *Plummer*, the fact of whether the alleged assault occurred was disputed and was not clearly resolved by the audio recording or photographs. Furthermore, unlike in *Pham*, the only witness to the alleged assault was Rowan, and she did not testify at the hearing, so Oliver was unable to cross-examine her. And lastly, ultimately, there was no record of conviction to base Oliver's expulsion on like there was in *Flaim*. Instead, it appears there was only a police report of officers who did not witness the alleged assault, but based their report on an interview with Rowan and an audio tape that was never disclosed to Oliver.

Therefore, because of the unique facts of this case, this Court cannot side step the issue of determining what additional procedures were necessary as the Fifth Circuit did in *Plummer*. *See Plummer*, 860 F.3d at 778–84 (J. Jones, dissenting) (stating that "[t]his case is the canary in the coal mine, arguing worse to come if appellate courts do not step in to [set a constitutional floor and] protect student's due process rights where allegations of quasi-criminal sexual misconduct arise"). Instead, as the Court has done, it must consider what specific procedures were allegedly employed and whether they were sufficient. At this stage, the Court finds that by not disclosing the incriminating evidence to Oliver before the hearing, combined with the lack of live testimony by Rowan or opportunity to cross-examination her, there was a substantial risk of erroneously depriving Oliver's interests through the procedures used, and the probable value of disclosing that evidence or having Rowan testify is clearly shown. Specifically, Oliver argues that had he been given that evidence in advance or had the opportunity to cross-examine Rowan, he could have shown that the audio tape was doctored and incomplete and that Rowan's bruises were from an injury at work that occurred a few days earlier, which ultimately is what was found to be true in the related criminal and civil proceedings that followed his expulsion. Doc. 16, Am. Compl., ¶¶ 4.32(b)–4.35.

Thus, having considered the minimum procedural due-process required in previous cases, as well as weighing the *Mathews* factors in light of this case's unique circumstances, the Court finds that Oliver has pled enough facts to show that Mihalic and Williamson, acting in both their official and individual capacities, deprived him of a meaningful opportunity to respond and defend the accusations made against him, which ultimately violated his right to procedural due process. Because the Court finds that Oliver has pled enough facts to show that Mihalic and Williamson violated Oliver's procedural due process rights and because the shield of qualified immunity only protects

governmental officials from money damages in their individual capacities, *see Morgan*, 659 F.3d at 401, the Court **DENIES** Defendants' Motion to Dismiss Oliver's procedural due process claims against Mihalic and Williamson in their official capacities for prospective injunctive relief and allows the claims to proceed to discovery.

2.    Are Defendants Entitled to Qualified Immunity?

Now the Court will address whether Mihalic and Williamson, in their individual capacities, are entitled to qualified immunity. Because the Court already finds that Oliver has adequately pled facts to show that Mihalic and Williamson violated his procedural due process rights, the Court need only decide step two of the qualified immunity inquiry—whether those rights were "clearly established" at the time of the challenged conduct. *Morgan*, 659 F.3d at 401. Defendants argue that even if the Court were to find a due process violation, there existed no clearly established constitutional rule affording Oliver more process than he was given. Doc. 24, Defs.' Mot. to Dismiss, 24–26. Oliver responds that fact issues preclude granting qualified immunity at this time and that his Amended Complaint alleges sufficient facts to proceed with his Section 1983 claims against the individual Defendants. Doc. 27, Pl.'s Resp., 23–28. Ultimately, the Court agrees with Oliver, and as previously noted above, finds that the incomplete record of what occurred at the hearing prevents this Court from issuing a final ruling on the issue of qualified immunity at this time. Thus, further limited factual discovery is needed.

"[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). Although a court is to decide the issue of qualified immunity as early

as possible, *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987), it would be a miscarriage of justice for this Court to rule on this issue without all of the relevant facts. That is why the Fifth Circuit "has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe*, 691 F.3d at 648. Because that is the case here, the Court undertakes this "careful procedure."

First, "a district court must [] find that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Id.* As discussed above, the Court finds that Oliver has pled sufficient facts to show that Mihalic and Williamson violated his rights to procedural due process by failing to disclose the incriminating evidence or requiring Rowan to testify or be cross-examined at the hearing. Thus, the issue is whether that right was "clearly established" at the time of the challenged conduct. *Morgan*, 659 F.3d at 401. The Fifth Circuit, in its en-banc decision in *Morgan* explained that when a court is determining whether a law or right is "clearly established" it is to do so based on the following guiding principles:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that *every* reasonable official would understand that what he is doing violates [the law]. To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority[13]—that defines the contours of the right in question with a high degree of particularity. . . . Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law[14]. . . . Although the Supreme Court has

---

[13] The Fifth Circuit clarified however that "[i]n a situation where no 'directly controlling authority' prohibits the defendants' conduct, we look to the law of other jurisdictions 'in assessing whether a reasonable [official] would have known . . . that his conduct was unlawful.'" *Morgan*, 659 F.3d at 372 n.26 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc)).

[14] However, the Supreme Court in *Hope v. Pelzer*, stated that "general statements of the law are not inherently incapable of giving fair and clear warning" and that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. 730, 741 (2002).

repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that a case directly on point is required. Rather, existing precedent must have placed the statutory or constitutional question *beyond debate*. The *sine qua non* of the clearly-established inquiry is fair warning.

*Id.* at 371–72 (internal quotations, citations, and footnotes omitted) (emphasis in original).

Regarding Mihalic, the Court finds that Oliver has pled sufficient facts regarding her investigation, which, if true, would overcome her qualified immunity defense because the investigation failed to abide by "clearly established" law stated by the Supreme Court in *Horowitz* and *Goss*, and the Fifth Circuit in *Dixon*—i.e., that she permanently expelled Oliver based on new evidence *before* disclosing it to him (in any form) or allowing him to respond. *See Goss*, 419 U.S. at 581 ("the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."); *Horowitz*, 435 U.S. at 86 (quoting *Goss*, 419 U.S. at 584) (students are entitled to limited due-process protections, in the form of "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'"); *Dixon*, 294 F.2d at 158 ("due process requires notice and some opportunity for hearing *before* a student at a tax-supported college is expelled for misconduct") (emphasis added). Simply stated, for decades, these courts and others have held that at a minimum, due process entitles students to some type of notice, presentation of evidence, and an opportunity to be heard before a student is expelled or suspended. Thus, Mihalic had fair warning that permanently expelling Oliver from medical school, without first giving Oliver the opportunity to respond to new evidence would be objectively unreasonable and violate the law. *Cf. Plummer*, 2015 WL 12734039, at *4 (university notified plaintiffs that it had

obtained additional evidence regarding their alleged misconduct and that plaintiffs had ten days to respond to the new allegations).

Regarding Williamson, the Court also finds that Oliver has pled sufficient facts regarding the hearing he presided over, which, if true, would overcome his qualified immunity defense because the hearing failed to abide by "clearly established" law—i.e. that in a case involving significant factual disputes, he failed to either disclose evidence relied on in affirming the expulsion or failed to require Rowan to testify at the hearing and allow cross examination. Unlike with Mihalic, there is no controlling case directly on point. However, because the contours of what is considered sufficient procedural due process is case-specific, the body of case law that defines what is "clearly established" in Williamson's case is far more expansive and is partially the reason why limited discovery is needed.

What is know to be "clearly established" law in student-disciplinary cases is that students who face permanent expulsion for misconduct violations are owed more formalized and stringent process than what the Supreme Court held was required in *Goss* or *Horiwitz*. *See Goss*, 419 U.S. at 584; *see also Horowitz*, 435 U.S. at 86 & n.3. For example, courts have held that in cases with significant factual disputes, such as where the "choice [is] between believing an accuser and an accused, [] cross-examination is not only beneficial, but essential to due process." *Flaim*, 418 F.3d at 641 (discussing *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)); *Cf. Plummer*, 860 F.3d at 775-776 (finding that determining whether confrontation and cross-examination of the accuser was not necessary because the university "did not rely on testimonial evidence from [the accuser] . . . nor that such testimony could have otherwise altered the impact of the videos and photo"). Also, courts have held that although the "weight of authority is against representation by counsel at disciplinary hearings," in cases where a "student is also facing criminal charges stemming from the incident in

question" representation by counsel is necessary. *Gorman v. Univ. of R.I.*, 837 F.2d 7, 16 (1st Cir. 1988); *see also Gabrilowitz v. Newman*, 582 F.2d 100 (1st Cir. 1978) (requiring right to counsel when criminal charges pending based on same incident). And lastly, the Texas Supreme Court in *Than* has held that presentation of *ex parte* evidence to a hearing officer, which he or she relies on in making the disciplinary decision, denies due process and requires a new hearing. *Than*, 901 S.W.2d at 932. In their Reply, Defendants state that the holding in *Than* cannot be "clearly established" law because the case is not on point—namely that Oliver did not allege that Mihalic or Williamson relied on or viewed/listened to the audio tape or police report containing the photographs before making, and upholding, the decision to expel him. Doc. 28, Defs' Reply, 8–9. However, without limited discovery Oliver cannot know for certain what Mihalic and Williamson did leading up to his expulsion. And as discussed above, Oliver does sufficiently allege that Mihalic and Williamson relied on this undisclosed evidence. Doc. 16, Am. Compl., ¶¶ 4.32(a), 6.05–6.06. Thus, if these allegations are true and depending on what evidence was presented and relied on in the hearing, Williamson also had fair warning that his failure to take simple additional procedures in a case involving serious ramifications would be objectively unreasonable and violate the law.

Second, because the Court finds that Oliver has asserted facts that, if true, would overcome the defense of qualified immunity, the Court must now determine what narrowly tailored discovery is needed to decide this issue. *See Backe*, 691 F.3d at 648. "Narrowly tailored" discovery is needed in part because "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Id.* Thus, limiting discovery will both allow Oliver's claims to be fairly adjudicated, while respecting Defendants' rights to not engage in costly and time-consuming discovery into unrelated issues. The Court will permit limited discovery

on three issues pertaining to Mihalic and Williamson's claims for qualified immunity:

> One: What evidence did Mihalic base her initial decision to expel Oliver for physical assault and what did Williamson rely on in affirming Mihalic's decision—e.g., did they listen to or rely on the audio recording, the colored photographs, or the statements Rowan made to UTSWPD; and did they have reason to know the audio recording was doctored or that Rowan's accusations were allegedly fabricated.

> Two: What occurred leading up to and at the hearing before Williamson—e.g. did UTSW present Oliver with a list of witnesses and evidence that would be presented at the hearing prior to the hearing; what evidence or live testimony did UTSW present at the hearing; was any evidence or witness statements on Oliver's behalf presented or considered; and who made the decision regarding who would testify at the hearing and on what basis was that decision made.

> Three: whether Oliver received a copy of the complete police report—e.g. when was he given the report; who gave him the report; what the report contained; and how was the report created.

Thus, to be clear, this Order does not deny Defendants' defense of qualified immunity and is also not an order refusing to rule on the issue until trial. Instead, the Court finds that limited and expedient discovery into the issues above is needed to rule on qualified immunity at a later date.[15] If discovery fails to uncover sufficient evidence that Mihalic and Williamson violated Oliver's "clearly established" due process rights, then they may be entitled to qualified immunity. However, because considering discovery evidence with regard to a motion to dismiss would convert such a motion into a motion for summary judgement, the Court finds that the parties would be better suited to file their summary-judgment motion(s) after the limited discovery is complete. *See Webb v. Livingston*, 2014 WL 1049983, at *8 (E.D. Tex. Mar. 17, 2014). Therefore, the Court **DEFERS** ruling on Defendants' Motion to Dismiss Oliver's procedural due process claims against Mihalic and Williamson in their

---

[15] If the parties request discovery outside the scope of these three issues that they believe will be needed in order to uncover evidence to overcome or enforce the Defendants' defense of qualified immunity in this case, the parties shall make a written request to do so.

individual capacities for damages until the issue of qualified immunity can be determined.

C.    *Title IX Gender Discrimination*

Next, the Court reviews Oliver's claim that UTSW[16]—through the investigation conducted by Mihalic, and the subsequent hearing by Williamson—engaged in impermissible gender bias in violation of Title IX's protection from students being subjected to discrimination on the basis of gender. Doc. 16, Am. Compl., ¶¶ 5.01–5.12.

Section 1681(a) provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that Congress gave the statute a broad reach by intending for the term "discrimination" to cover "a wide range of intentional unequal treatment" on the basis of sex. *Jackson*, 544 U.S. at 175.

This broad interpretation has lead to courts creating four generalized theories of liability under Title IX: "(1) plaintiffs claiming an erroneous outcome of a disciplinary proceeding, (2) plaintiffs claiming selective enforcement of university procedures to students of different sexes, (3) plaintiffs claiming deliberate indifference to sexual harassment or sexual assault on campus, and (4) plaintiffs claiming a university's actions based on archaic assumptions about the roles or behavior of men and women." *Pacheco v. St. Mary's Univ.*, 2017 WL 2670758, at \*11 (W.D. Tex. June 20,

---

[16] UTSW "as a recipient of federal funding, can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex." *Plummer*, 860 F.3d at 777 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)). Although Title IX reaches institutions and programs in receipt of federal funds, it does not authorize suits against school officials, teachers, and other individuals. *See* 20 U.S.C. § 1681(a), (c); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

2017) (citations omitted).

Here, Oliver relies on the Second Circuit's decision in *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)[17] in arguing that he was subject to "erroneous outcome" and "selective enforcement"[18] discrimination. Doc. 16, Am. Compl., ¶¶ 5.01–5.12. Under the "erroneous outcome" theory of liability, "the claim is that the charged student (plaintiff) was innocent and wrongly found to have committed an offense." *Plummer*, 860 F.3d at 777 (citing *Yusuf*, 35 F.3d at 715). Where under the "selective enforcement" theory of liability, the claim is "that regardless of the student's culpability, the severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender." *Id.* Although a plaintiff may plead both in the alternative, "in neither case do wholly conclusory allegations suffice for purposes of Rule 12(b)(6)." *Yusuf*, 35 F.3d at 715. The Court will address each claim in turn.

To state a viable "erroneous outcome" claim, a plaintiff must (1) "allege particular facts

---

[17] Defendants urge this Court to not adopt a cause of action that the Fifth Circuit has not yet adopted. Doc. 24, Defs.' Mot. to Dismiss, 6–7. However, Defendants do not cite to any Fifth Circuit case declining to adopt such theories of liability established in *Yusuf*. Instead, while the Fifth Circuit has not explicitly adopted those theories, it has cited *Yusuf* with some approval and analyzed Title IX claims in light of the principles established in *Yusuf*. *See Plummer*, 860 F.3d at 777–78 (noting that because the students and the university "each rely on the theories adopted in *Yusuf*, [the Court] need not speculate on any other possible theories of Title IX liability"). Similarly here, both parties rely on the theories established by *Yusuf* in arguing their respective positions. Thus, the Court joins others in this circuit in finding that based on the history and text of Title IX itself, the statute applies in this context, and that *Yusuf* provides a useful framework for analyzing Oliver's claims. *See, e.g., Doe v. Univ. of Miss.*, 2019 WL 238098, at *4–5 (S.D. Miss. Jan. 16, 2019); *Klocke v. Univ. of Tex. at Arlington*, 2018 WL 2744972, at *5–6 (N.D. Tex. June 7, 2018); *Pacheco v. St. Mary's Univ.*, 2017 WL 2670758, at *14–15 (W.D. Tex. June 20, 2017).

[18] In their Reply, Defendants argue that Oliver only raised the claim of "selective enforcement" discrimination in his Response to the Motion to Dismiss, and thus, he is now attempting to amend his complaint. Doc. 28, Defs. Reply, 2, 4. However, that is not the case. Although Oliver explicitly states only that he "was subjected to 'erroneous outcome' discrimination" in his Amended Complaint, Doc. 16, Am. Compl., ¶ 5.04, and does not restate the same for "selective enforcement" discrimination, he does state the legal standard for the theory in his Amended Complaint as well as facts that he argues support that claim. *Id.* ¶¶ 5.03 (legal standard), 5.07 (alleged facts supporting claim).

sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding;" and (2) show that "gender bias was a motivating factor behind the erroneous finding." *Id.* Because of the unique facts and evidentiary weaknesses in UTSW's case against Oliver, which the Court noted above, the Court finds that Oliver clearly meets the pleading burden for the first element. *See id.* ("[A] complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge."). Here, the audio tape of the altercation was allegedly doctored, UTSW had reason to believe that Rowan lacked credibility and had a motive to lie against Oliver, and Oliver had a defense to the alleged physical altercation (defense of property).

Thus, the question becomes whether Oliver's Amended Complaint contains particularized facts to satisfy his pleading burden of showing that gender was a motivating factor in this erroneous outcome. *See id.* (noting that "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" can satisfy the plaintiff's burden to show gender bias). To show that gender was a motivating factor in the erroneous outcome, Oliver asserts that his gender (male), combined with the gender of the victim in this case (female), caused UTSW to take the woman's testimony and allegations of physical assault as "sacrosanct," and ignored Oliver's objections to the processes followed and defenses to that allegation. Doc. 16, Am. Compl., ¶¶ 5.04–5.06, 5.08–5.09. Specifically, he alleges that UTSW failed to require Rowan to testify or be cross-examined at the hearing; ignored receipts showing that he owned the computer at the center of the altercation, and thus, was defending his property; and failed to mention in the expulsion letter the reason for why he let out the air from

Rowan's tire—i.e., because she was allegedly heavily intoxicated at the time and had a history of DWI's. *Id.* ¶¶ 5.05, 5.08–5.09. Oliver also argues that the officers who authored the police report UTSW relied on "made remarks showing bias against male participants in domestic situations that: (1) [Oliver] had fled the scene of an alleged crime; (2) that [Oliver] refused to be interviewed; and (3) retaining an attorney implied guilt." *Id.* ¶¶ 4.20, 5.04.

Oliver also asks this Court to infer that Mihalic was prejudiced against men because she imposed short notices on meetings and hearings, was dismissive of his explanations, and may have made statements and participated in organizations advocating for the need for more women in medicine and teaching a self-defense classes exclusively for women. *Id.* ¶ 5.10. And lastly, Oliver alleges that "UTSW's kangaroo court was part of a larger movement precipitated by the infamous 'Dear Colleague' letter from the Department of Education under the Obama Administration intended to bias campus proceeding[s] in favor of primarily women complainants." *Id.* ¶ 5.11.

First, the Court finds that Oliver's speculations about Mihalic, arguing that she is biased in favor of women based on her advocacy roles and her alleged dismissive nature—absent more particularized facts or statements—are not facts that show intentional discrimination or prejudice against men. *See Bleiler v. Coll. of Holy Cross*, 2013 WL 4714340, at *13 (D. Mass. Aug. 26, 2013) ("alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences."); *see also Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1077–78 (D. Colo. 2017) (refusing to find an inference of gender bias when one of the female Title IX investigator's career focus was women's studies and victim advocacy and she had been quoted in an article calling male students accused of sexual assault "perpetrators"). " Moreover, pressure from the federal government to investigate sexual assault allegations more aggressively—either general

pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men." *Univ. of Col., Boulder*, 255 F. Supp. 3d at 1078.

Those arguments set aside, Oliver does plead other particularized facts that satisfy his pleading burden of showing that gender was a motivating factor. For one, the Court finds that the alleged lack of reference to any exculpatory facts—such as the fact that Oliver owned the computer in question and was defending his property, the facts surrounding Rowan's tire being deflated, or not considering other mitigating factors regarding Rowan's motive to fabricate the allegations—both in Mihalic's expulsion letter or the hearing show a desire to bolster Rowan's accusations while disregarding Oliver's defenses. *See Doe v. Univ. of Miss.*, 2019 WL 238098, at *5 (S.D. Miss. Jan. 16, 2019) (finding that Title XI Coordinator's lack of effort in compiling all the evidence, including exculpatory evidence, before expelling the plaintiff was enough in part to state a plausible claim of gender bias). Also, the Court finds it troubling that when Mihalic came into possession of new evidence, including statements made to the police by a woman accuser and the audio recording, she chose to immediately expel Oliver, instead of investigating the claims further in light of this new evidence. It could very well be that UTSW considered these defenses; however, the lack of any record or mention of them in the expulsion letter or the hearing supports a claim, at this stage, that Oliver's gender was a motivating factor in this erroneous outcome. This inference of gender bias in the erroneous outcome is further exacerbated by the fact that Oliver was never given access to the incriminating evidence against him nor was Rowan required to testify against him at trial, which significantly limited his ability to mount a viable defense.

Also, the Court finds that the statements made by the two UTSWPD officers regarding males

accused of domestic violence show that gender was a motivating factor in the erroneous outcome. Defendants argue that these statements by the officers cannot support an inference of gender bias because they were not made by the decision makers, Mihalic or Williamson. Doc. 24, Defs.' Mot. to Dismiss, 10. However, that argument goes to the weight that those allegations should be given in showing gender bias, and does not mean the Court cannot consider these biased "statements by pertinent university officials," *Yusuf*, 35 F.3d at 715, who authored a police report that Defendants concede to relying on in deciding to expel Oliver. Doc. 27-1, Notice of Disciplinary Action, 1–2. In sum, the Court finds that Oliver has stated a viable "erroneous outcome" claim.

Next, under the "selective enforcement" theory of liability, Oliver must plead "that regardless of the student's culpability, the severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender." *Plummer*, 860 F.3d at 777 (citing *Yusuf*, 35 F.3d at 715). "In other words, the plaintiff must show that a person of the opposite sex was in circumstances sufficiently similar to plaintiff's and was treated more favorably by defendant." *Klocke v. Univ. of Tex. at Arlington*, 2018 WL 2744972, at *6 (N.D. Tex. June 7, 2018). "This type of claim is centered on the familiar concept of disparate treatment accompanying traditional discrimination cases." *Pacheco*, 2017 WL 2670758, at *18. Here, Oliver alleges that he complained to the UTSWPD that Rowan had broken into his apartment, stolen his belongings, and assaulted him, but UTSPD chose to not pursue charges against her. Doc. 16, Am. Compl., ¶ 5.07. Defendants argue that Oliver fails to plead a viable "selective enforcement" claim because the only female he identifies, Rowan, did not face similar disciplinary charges because she who was not a student at UTSW. Doc. 28, Defs.' Reply, 4. The Court agrees with Defendants and finds that relying on Rowan as a comparator does not state a viable "selective enforcement" claim.

Thus, taking Oliver's particularized facts together and viewing them in the light most favorable to him, the Court finds that these allegations state a plausible claim of gender bias in the outcome of his expulsion. The Court reaches this conclusion cognizant that a school's disciplinary body "is entitled to a presumption of honesty and integrity absent a showing of actual bias such as animosity, prejudice, or a personal or financial stake in the outcome;" *Bleiler*, 2013 WL 4714340, at *13, however, in light of the facts alleged, the Court finds that further discovery is needed to ensure that Oliver's Title IX protections were complied with. While Defendants' arguments might ultimately prevail on summary judgment, the Court recognizes that at this stage Oliver must only "nudge[ his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. It finds that he has, and thus, **DENIES** Defendants' Motion to Dismiss as to Oliver's Title IX claims against UTSW.

D.     *First Amendment Retaliation*

And lastly, the Court reviews Oliver's claim that in expelling him based on his admission to Mihalic that he "argued with his fiancée" and based on an audio tape of him "yelling at the complainant," Defendants retaliated against him based on constitutionally protected speech. Doc. 16, Am. Compl., ¶¶ 7.01–7.04. The Supreme Court has held that a state university cannot expel a student in retaliation for engaging in an activity protected by the First Amendment. *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669–71 (1973). Thus, to establish a valid retaliation claim under the First Amendment, a plaintiff student has the burden to show that (1) his or her speech was constitutionally protected and (2) that it was a "substantial" or "motivating" factor in the challenged decision. *O'Neal*, 2010 WL 376602, at *11 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If the plaintiff satisfies his or her initial burden, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same

decision even in the absence of the protected conduct. *Doyle*, 429 U.S. at 287. The Court finds that Oliver's allegations fail to state a valid First Amendment retaliation claim for two reasons: (1) he fails to show that he was engaged in constitutionally protected speech, and (2) even if the Court were to assume he was, Oliver fails to show that chilling his speech was a substantial or motivating factor in UTSW's decision to expel him from medical school.

First, the Supreme Court has long held that threats of violence or "true threats" are not protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 360 (2003). "In determining whether a statement amounts to an unprotected threat, there is no requirement that the speaker intended to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence." *Doe v. Pulaski Cty/ Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002). Thus, regardless of whether Oliver intended to or did in fact harm Rowan, speech can still be a "true threat," and thus not protected speech, if in the viewpoint of a reasonable recipient it is interpreted as a serious expression of an intent to commit an act of unlawful violence. *See O'Neal*, 2010 WL 376602, at *14. Here, instead of arguing that his argument with his former fiancée was not a "true threat," Oliver argues that because Rowan had disclosed to him during their argument that she had allegedly cheated on him, his anger was warranted, and thus, amounted to protected speech. Doc. 27, Pl.'s Resp., 30. However, Oliver does not point to and the Court does not find any case law supporting the idea that threats of violence can be protected speech in certain contexts where the speaker is provoked. The Court notes that although the Court, at this stage, does not know the extent of what was said on the audio tape, it is still Oliver's burden to show that he was engaged in protected speech, and he has failed to do so.

Second, and more importantly, even if the full conversations on the audio tape were disclosed

and the Court found that it did not rise to the level of "true threats," Oliver has still failed to allege that this speech was a substantial or motivating factor in expelling Oliver. The reason is because UTSW did not expel Oliver for having an argument with his former fiancée, but instead because they believed that he had physical assaulted her.

As discussed above, in his initial meeting with Mihalic, Oliver had admitted to getting into a verbal argument with Rowan. Doc. 27-1, Notice of Disciplinary Action, 1. However, even with that admission, Mihalic found there was insufficient evidence to find that he assaulted Rowan and chose to drop the charges. *Id.* It was only when the school received more evidence suggesting that a physical assault had occurred that the school chose to expel Oliver. *Id.* (noting accusations made by Rowan that Oliver grabbed her wrists and caused her to fall and hurt her tailbone, and hearing sounds of struggle on the audio tape in support of the decision to expel Oliver).

Thus, the Court finds that any potentially protected speech made by Oliver was not a substantial or motivating factor in expelling him. Therefore, because Oliver has failed to meet his burden to show that he was engaged in protected speech or that any potentially protected speech was a motivating factor in expelling him, the Court **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(6) and **DISMISSES** Oliver's First Amendment retaliation claim.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS in part, DENIES in part, and DEFERS in part** Defendants' Motion to Dismiss (Doc. 23). To summarize, the Court:

- **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(1) as to all of Oliver's Texas Constitution claims brought against all Defendants and **DISMISSES** these claims;

- **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(1) as to Oliver's §1983 claims against UTSW and against the two UTSW employees in their official capacities for damages and **DISMISSES** these claims;

- **DENIES** Defendants' Motion to Dismiss under Rule 12(b)(6) as to Oliver's procedural due process claims against Mihalic and Williamson in their official capacities for prospective injunctive relief;

- **DEFERS** ruling on Defendants' Motion to Dismiss under Rule 12(b)(6) as to Oliver's procedural due process claims against Mihalic and Williamson in their individual capacities for damages until further limited discovery is conducted;

- **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(6) as to Oliver's substantive due process claim against Mihalic and Williamson in their official and individual capacities, and thus, the Court **DISMISSES** this claim.

- **DENIES** Defendants' Motion to Dismiss under Rule 12(b)(6) as to Oliver's Title IX gender discrimination claim; and

- **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(6) as to Oliver's First Amendment claim against UTSW and **DISMISSES** this claim.

Therefore, the remaining claims in this suit are Oliver's (1) procedural due process claims against Mihalic and Williamson in their official and individual capacities; and (2) Title IX gender discrimination claim against UTSW. All other claims are dismissed.

      **SO ORDERED.**

      **SIGNED: February 11, 2019.**

 

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE